**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WÄRTSILÄ NSD NORTH | : | |
| AMERICA, INC., | : | Civil Action No. 99-4565 |
| | : | |
| Plaintiff, | : | |
| | : | **OPINION** |
| v. | : | |
| | : | |
| HILL INTERNATIONAL, INC., | : | |
| | : | |
| Defendant. | : | |

**Appearances:**

Richard E. Brennan, Esquire
Michael O. Adelman, Esquire
Mark R. Galdieri, Esquire
Drinker Biddle & Reath, LLP
500 Campus Drive
Florham Park, NJ 97932-1047
        Attorneys for Plaintiff

David L. Braverman, Esquire
Braverman Daniels Kaskey Ltd.
1650 Market Street, 21st Floor
Philadelphia, PA 19103

M. Frances Ryan, Esquire
J. Ian Downes, Esquire
Dechert LLP
Princeton Pike Corporate Center
PO Box 5218
Princeton, NJ 08543
        Attorneys for Defendant

1

**RODRIGUEZ, Senior District Judge**.

This matter comes before the Court on Defendant Hill International, Inc.'s ("Hill") Motion to Mold the Verdict and Enter Judgment Consistent with the Parties' Written Contract [Docket No. 258]. This case presents the Court with a unique factual scenario wherein if it accepts Defendant's arguments, Defendant would have no obligations under the very contract it seeks to enforce. For the reasons expressed herein, the motion will be denied.

## PROCEDURAL HISTORY AND FACTUAL BACKGROUND

The background facts of this case are well known to this Court and the parties and are set forth at length at Wärtsilä NSD N. Am. v. Hill Int'l, Inc., 269 F. Supp. 2d 547, 549-51 (D.N.J. 2003). They will only be repeated here to the extent relevant to the disposition of this motion:

> In July 1994, Wärtsilä Diesel, Inc., an engineering and construction company and the predecessor to Plaintiff Wärtsilä NSD North America, Inc. ("Wärtsilä"), entered into a contract with Coastal Salvadorian Ltd. ("Coastal"), wherein Wärtsilä agreed to design, engineer, procure, construct, start up and test a diesel engine power plant in Nejapa, El Salvador ("the Project"). (Pl.'s First Supplemental & Amended Complaint at ¶ 6). Wärtsilä, whose business had up to that point focused primarily on the sale and maintenance of diesel engines, in turn subcontracted much of the plant's construction to a variety of other entities, including Black & Veatch International ("BVI"). (Id. at ¶¶ 7-8). The Project quickly fell behind schedule, resulting in numerous contractual disputes between Wärtsilä, BVI, and Coastal. (Id. at ¶ 9). In an effort to get the project back on track, Wärtsilä sought the services of a construction consulting firm that could provide expert advice and management for the Project. (Id. at ¶ 10).
> On January 18, 1995, Hill International, Inc. [("Hill")] submitted a proposal for the consulting position. (Id. at ¶ 31). In its proposal, Hill

2

recommended that Richard LeFebvre, one of the firm's senior consultants, be assigned to the Project to "collect, organize and evaluate . . . factual information and report . . . his findings as to the best way to proceed with the completion of the project." (Id. at ¶ 33). LeFebvre's responsibilities were to include gathering information and materials related to the construction project, visiting the project site "to evaluate the adequacy of the plans and specifications," and comparing the actual performance of the construction work to Wärtsilä's obligations under its contract with Coastal. (Id.) Attached to the proposal was a copy of LeFebvre's professional resume which represented that he: (a) had received a B.S. in electrical engineering from Penn State in 1966; (b) had earned a B.A. in business administration from Duquesne University in 1969; (c) had taken courses in business law at the University of North Florida in 1983; and (d) was registered and licensed as a professional engineer in Pennsylvania, New York, and Massachusetts. (Id. at ¶ 32).

On January 24, 1995, Wärtsilä and Hill entered into a written consulting agreement that incorporated by reference the January 18 proposal. (Id. at ¶ 34). Pursuant to the terms of the agreement, Hill assigned LeFebvre to work as a senior consultant on the Project. (Id. at ¶ 35). LeFebvre was quickly promoted by Wärtsilä to the position of Project Manager and continued to work on the Project as a Hill employee until May 25, 1995. (Id. at ¶¶ 37, 40). Among his responsibilities was the task of analyzing issues bearing on potential claims and defenses in contractual disputes between Wärtsilä and BVI. (Id. at ¶¶ 38-39).

On June 1, 1995, with Hill's approval, Wärtsilä hired LeFebvre "as an independent contractor to provide assistance with construction and claims management on the Project." (Id. at ¶ 41). Based in part on LeFebvre's analysis and recommendations, Wärtsilä in May 1996 decided to pursue claims against BVI before the American Arbitration Association and retained the Louisiana law firm of Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., and two of its attorneys, John H. Clegg, Esq., and Daphne McNutt, Esq., to initiate arbitration proceedings against BVI in Charlotte, North Carolina. (Id. at ¶ 43; Third Party Complaint at ¶ 11). LeFebvre became a "key witness" in the proceedings due to his intimate and extensive knowledge of the facts underlying the points of contention between the two parties and his participation in the drafting of various "claim support" documents. (Pl.'s First Amended Compl. at ¶¶ 43-44).

At the arbitration proceedings in September 1997, LeFebvre offered testimony regarding the academic and professional credentials listed on his resume. (Id. at ¶ 47). On September 8, 1997, toward the end of his direct testimony, Wärtsilä became aware, "for the first time," that there were

questions concerning LeFebvre's educational and professional credentials when counsel for BVI requested that LeFebvre execute a release for background academic information. (Id. at ¶ 48). Later that day, after the proceedings had been adjourned, LeFebvre admitted to Wärtsilä's attorneys that the statements on his resume concerning a business degree from Duquesne University were not accurate. (Id. at ¶ 49). He allegedly told Wärtsilä that Hill had asked him to overstate the extent of his training at Duquesne. (Id.).

The next morning, LeFebvre requested and received from Hill a revised resume which omitted any reference to a business degree from Duquesne or business law courses at North Florida and modified the date on which he claimed to have received an electrical engineering degree from Penn State. (Id. at ¶ 50). When the proceedings resumed later that day, BVI's attorneys subjected LeFebvre to a vigorous cross-examination, forcing him to acknowledge the obvious inconsistencies between the two resumes. LeFebvre nevertheless insisted that the revised resume was entirely accurate and truthful. (Id. at ¶ 50(b)). However, by the conclusion of the day's proceedings, Wärtsilä's attorneys were forced to concede that a hasty investigation into LeFebvre's academic credentials had uncovered no evidence that he had ever received an engineering degree from Penn State or attended any of the other schools listed on his resume. (Id. at ¶ 51). Wärtsilä also found no evidence that LeFebvre had ever been licensed as a professional engineer in either New York, Pennsylvania, or Massachusetts. (Id.).

In light of LeFebvre's perjury, Wärtsilä's counsel withdrew his testimony, and the arbitration panel granted Wärtsilä a short recess to restructure its case based on new witnesses. (Id. at ¶ 53). During that time, the company re-examined materials prepared by LeFebvre and discovered that he had improperly altered original "claim support" documents. (Id. at ¶ 53). Consequently, Wärtsilä was forced to withdraw certain claims. (Id.) On March 5, 1998, the arbitration panel issued a judgment of $4.65 million in favor of BVI. (Id. at ¶ 57). Wärtsilä attributes the arbitration award to the complete loss of credibility it allegedly suffered as a result of LeFebvre's blatant misrepresentations, both on his resume and in his testimony before the arbitration panel. (Id. at ¶ 52).

Wärtsilä, 269 F. Supp. 2d at 549-51.

On February 14, 2006, a jury trial commenced before this Court. During the

pendency of the trial, the applicability of the exculpatory clause[1] contained in the

Consulting Agreement was brought before the Court.[2]  The Court reserved judgment on

the issue so that it could be considered in light of the jury's findings.  At trial, Wärtsilä

advanced claims of negligence, breach of contract and fraud.  On March 6, 2006, the jury

found in favor of Wärtsilä with respect to the negligence and breach of contract claims.

As to the fraud claim, the jury found in favor of Hill.  The jury awarded Wärtsilä

$2,047,952.00.

Hill argues that the exculpatory clause is valid and enforceable in the absence of a

jury finding of fraud.  Wärtsilä argues that the clause is unenforceable and violative of

public policy.  Wärtsilä also argues that, in any event, the exculpatory clause does not

operate here because its damages are direct.  These arguments will be taken in turn.

---

[1]Hill disputes whether the clause is a limitation of remedies clause or an
exculpatory clause; however, it suggests that because "even broad exculpatory clauses are
routinely enforced under Maryland law," that it is essentially a distinction without
difference.  (Def's Motion to Mold Verdict, p. 12.)  Therefore, the Court will refer to the
clause at issue in this Motion as an "exculpatory clause" for ease of reference and
consistency, without reading into that phrase any special meaning.

[2]The exculpatory clause reads as follows:
In no event shall Consultant be liable in contract or tort or otherwise, to
Company for any lost, delayed or diminished profits, revenues, or
opportunities, losses by reason of shutdown or inability to utilize or
complete the Project, or any other incidental, special, indirect or
consequential damages of any kind or nature whatsoever resulting from
Consultant's performance or failure to perform services under this
Agreement.
(Def's Motion to Mold Verdict, Exh. A.)

## DISCUSSION

**A.  Validity and Enforceability of the Exculpatory Clause as to Wärtsilä's Claim for Breach of Contract**

The Court of Appeals of Maryland, the state's highest court, has held that "[i]t is well settled in this State, consistent with 'the public policy of freedom of contract,' that exculpatory contractual clauses <u>generally</u> are valid."[3]  <u>Adloo v. H.T. Brown</u>, 686 A.2d 298, 301 (Md. 1996) (quoting <u>Wolf v. Ford</u>, 644 A.2d 522, 525 (Md. 1994) (emphasis added)).   Hill urges this Court to interpret this language as a far-reaching approval of all exculpatory clauses, including those that preclude liability for breach of contract claims. (Def's Motion to Mold Verdict, p. 4.)  However, for the reasons stated below, this Court does not read <u>Adloo</u> so broadly.

Maryland's Court of Special Appeals has held that exculpatory clauses do not operate to bar claims for pure breach of contract.  <u>Kline v. Knight</u>, No. 2238, 2000 WL 33799690, at *38 (Md. Ct. Spec. App. Dec. 21, 2000).  In <u>Kline</u>, the parties had entered into a joint venture that ultimately failed.  <u>Id.</u> at *1.  The plaintiffs levied claims sounding in contract and tort against the defendants.  <u>Id.</u>  The lower court granted summary judgment in favor of defendants, relying in part on the exculpatory clause contained in the contract because the plaintiff failed to show actual fraud, gross negligence, or dishonest

---

[3]The parties agree, and the Consulting Agreement provides, that the interpretation of the contract is governed by Maryland law.  <u>See</u> (Def's Motion to Mold Verdict, Exh. B, at p. 8).

6

conduct.  Id.  The exculpatory clause stated:

> 9.03 Liability.  Except as otherwise provided in Section 9.04 of this
> Agreement, no Venturer shall be liable to any other Venturer or to the Joint
> Venture by reason of his or her actions in connection with the Joint Venture
> except in the case of actual fraud, gross negligence or dishonest conduct.

Id. at 7.

The Court of Special Appeals reversed the lower court's grant of summary

judgment on those breach of contract claims not barred by the statute of limitations.  Id. at

*37.  The court reasoned that:

> Although exculpatory clauses are used in contracts, we have neither
> found nor been referred to any authority that suggests such provisions apply
> with regard to a pure breach of contract action. In our view, an exculpatory
> clause might well apply to a claim for negligent breach of contract, i.e., a tort
> action arising from a contract. Indeed, if [the defendant] and the court below
> are correct in their construction of the clause, it would essentially render a
> contract useless, because any failure to perform in accordance with its terms
> would be excused, so long as the breach was not malevolent or deliberate.

Id. at 38 (emphasis added).  The Court finds this reasoning both persuasive and indicative

of the position that would be taken by the Court of Appeals of Maryland.  See Clark v.

Modern Group Ltd., 9 F.3d 321, 326-27 (3d Cir. 1993) (holding that when sitting in

diversity, the federal courts "apply the substantive law of the forum [and when] the

application of that law is not clear, . . . [they] must forecast the position the supreme court

of the forum would take on the issue").

Like in Kline, neither this Court nor the parties have been able to find any binding

authority for the proposition that exculpatory clauses operate to bar recovery for pure

breach of contract damages.  In addition, a survey of decisions by the Court of Appeals of

Maryland indicates that the court contemplates exculpatory clauses in the context of tort

liability.  In <u>Wolf</u>, the plaintiff argued that the exculpatory clause in the contract between

the parties was void.  644 A.2d at 525.  The Court of Appeals, after noting that

exculpatory clauses are generally valid, stated that the rule has also been explained as

follows:

> It is quite possible for the parties expressly to agree in advance that the
> defendant is under no obligation of care for the benefit of the plaintiff, and
> shall not be liable for the consequences of conduct <u>which would otherwise be
> negligent</u>.  There is in the ordinary case no public policy which prevents the
> parties from contracting as they see fit. . . .

<u>Id.</u> (emphasis added).  The court also quoted Prosser and Keeton's treatise on tort law,

which states that "a party to a contract can ordinarily exempt himself from <u>liability for

harm caused by his failure to observe the standard of reasonable care imposed by the law

of negligence</u>."  <u>Id.</u> (quoting W. Page Keeton, et al., <u>Prosser and Keeton on the Law of

Torts</u>, § 68, at 482 (5th ed. 1984)) (emphasis added).

Moreover, Hill cites the following in support of its proposition that the parties to a

contract may validly limit liability for <u>both breach of contract and negligence</u>:

> It is black-letter law that not only may the parties to a contract limit liability for
> breach of contract, they may also limit the damages recoverable as a result of
> a party's negligence.  As the Restatement (Second) of Contracts notes, "a party
> to a contract can ordinarily exempt himself from liability for harm caused by
> his failure to observe the standard of reasonable care imposed by the law of
> negligence."

(Def. Motion to Mold Verdict, pp. 6-7) (internal citations omitted).  Notably, Hill did not

cite a single Maryland source for the proposition that an exculpatory clause may operate to preclude liability for a breach of contract.

This case may well be different if the breach of contract or finding of negligence did not go to the very essence of the agreement of the parties.  That is, Hill agreed to provide Wärtsilä with a consultant, Richard LeFebvre, who was represented as a licensed engineer.  Hill's failure to provide a licensed engineer was a fundamental, pure breach of its contractual obligation to Wärtsilä.

Finally, Hill suggests that "acceptance of Wärtsilä's argument would lead to an unprecedented result in the construction industry, where consultants of all sorts use exactly the type of clause invoked by Hill to enable them to provide limited services on large, contentious projects without running the risk of crippling liabilities that they should not justly have to bear."  (Def's Motion to Mold Verdict, p. 11.)  Hill goes on to explain that its efforts are legitimate and fundamental to its survival as a business.  (Def's Motion to Mold Verdict, p. 11.)  While Hill's concern is understandable, it is unfounded based on the facts presented by this case.

The clause used by Hill and "consultants of all sorts" in the construction industry intends to shield those parties from liability for specific damages.  As pointed out by Hill in its brief in support of this Motion, through the testimony of its own witness, David Richter:

> We almost always put a provision like this in our contracts.  We're providing services in connection very often with very large projects, sometimes, like this

9

one, we're brought in the middle after it's already troubled, on projected ranging from millions to billions of dollars, and the service we're providing is essentially putting people on the job to act as consultants or advisors to our clients.  We're doing that at a markup which does not generate a lot of profit for us.  <u>We can't be held responsible for</u>–based upon how we price to our clients, we can't be held responsible for–<u>if they say, you know, we didn't deliver a schedule on time, you owe us $3,000,000 because you made the whole project late</u>, we can't open ourselves up to that kind of liability as a business.  So we almost put this–certainly try to, but we almost always put this in the contracts that we entered into with clients to protect ourselves as a business.

(Def's Motion to Mold Verdict, Exh. G–Trial Tr. Of David Richter, pp. 78:16-79:6)

(emphasis added).  Hill also cites language from a letter from it to Wärtsilä, which states "because of the unique nature of this assignment <u>and the fact that the project was behind schedule before our involvement</u>, we have proposed new language to . . . exclude consequential damages or other indirect loss."  (Def's Motion to Mold Verdict, Exh. A)

(emphasis added).[4]

In this case, the jury was not asked to assign liability and/or damages in favor of Wärtsilä on the basis of delay or even professional malpractice committed by the consultant Hill provided; however, the jury <u>was</u> asked whether Hill breached its contract with Wärtsilä by providing a consultant who did not possess the qualifications upon

---

[4]The Court does not cite this language to suggest that its holding rests, in any part, on the notion that it is enforcing the intent of the parties, <u>see</u> <u>Calomiris v. Woods</u>, 727 A.2d 358, 368 (Md. 1999) (holding that "courts should enforce the terms of unambiguous written contracts without regard to the consequences of that enforcement"); rather, the language is cited to illustrate the usual purpose, by Hill's own admission, of such a clause and the absurd result that would be reached if this Court were to accept Hill's argument.

which he was sold.  The damages Wärtsilä sought were not the result of a delay caused by a subcontractor three years earlier in the project.  To be sure, if those were the facts presented by this case, the result almost certainly would be different.  In contrast, the damages Wärtsilä sought, and ultimately awarded by the jury, were the result of the complete breakdown of the arbitration process that occurred once the qualifications of the consultant provided by Hill were exposed as untrue.

At bottom, and as found by the jury, Hill failed to provide Wärtsilä with the very service it contracted to perform.  Despite its language, enforcement of the exculpatory clause would lead to a repugnant result–one that would allow a service provider to reap the benefit of a negotiated agreement in the absence of the bargained-for performance. While the Court is aware that unambiguous written contracts should be enforced without regard to the consequences of that enforcement, based on the analysis above, this Court finds that Maryland law will not allow such a clause to be enforced.  Therefore, the Motion to Mold the Verdict will be denied.

## B.  Consequential or Indirect Damages v. Direct Damages

Hill argues that the damages sought by Wärtsilä are precluded by the exculpatory clause because they are "incidental, special, indirect or consequential."  Wärtsilä argues that the damages it seeks are direct, and are not, therefore, barred by the clause.  Wärtsilä is correct.

Maryland courts follow the rule established in Hadley v. Baxendale, 9 Ex. 341,

11

156 Eng. Rep. 145 (1854), "that damages which a plaintiff may recover for breach of contract include both those which may fairly and reasonably be considered as arising naturally from the breach (general damages) and those which may reasonably be supposed to have been in the contemplation of both parties at the time of making of the contract (special damages)." Addressograph-Mutligraph Corp. v. Zink, 329 A.2d 28, 33-34 (Md. 1974); see also U.S. Telegrpah Co. v. Gildersleve, 29 Md. 232, 249-51 (1868) (adopting the rule established in Hadley v. Baxendale).

Direct damages are those that flow naturally and ordinarily from the alleged breach.  In Ryan Inc. E. v. Toll Bros. Inc., 43 F. App'x 601, 602-03 (4th Cir. 2002), the plaintiff sought damages from the defendant for, among other things, additional labor and equipment rental costs because of defendant's delay and interference with the project. Although the defendant argued that these expenses were consequential, the court held that "[u]nlike consequential damages, which 'arise from the intervention of 'special circumstances' not ordinarily predictable,' [the plaintiff's] claimed damages were alleged simply to be the extra costs for labor and equipment brought on by having to perform work out of sequence and thus were the 'natural' and 'ordinary' result of [the defendant's] alleged breach of contract." Id. at 604 (quoting Roanoke Hosp. Ass'n v. Doyle & Russell, Inc., 214 S.E.2d 155, 160 (Va. 1975)).

There is no general rule that direct damages are limited to the difference between the value of the product or service contracted for and the value of the product or service

12

actually provided.  See Applied Data Processing, Inc. v. Burroughs Corp., 394 F. Supp.

504, 509 (D. Conn. 1975) (rejecting expressly the notion that "direct damages [are

limited] to the different between the value of the equipment as warranted and its value as

delivered") (citing Ruggles v. Bufalo Foundry & Mach. Co., 27 F.2d 234 (6th Cir.

1928);Clark v. Ferro Corp., 237 F. Supp. 230, 239 (E.D. Tenn. 1964); Sinker, David &

Co. v. Diggins, 43 N.W. 674 (Mich. 1889)).  For example, in 21st Century Props. Co. v.

Carpenter Insulation & Coatings Co., 694 F. Supp. 148, 150 (D. Md. 1988), the plaintiffs

brought claims of misrepresentation, breach of contract and breach of express warranty

against the defendant after four of the roofs it had installed began to leak.  The plaintiffs

sought to recover the cost of replacing the defective roof, rather than the cost to repair it.

Id. at 152.  The defendant argued that the exculpatory clause barred the plaintiffs from

recovering the monetary damages because they were consequential.  Id. at 152 n.4.  The

court, construing Maryland law, held that "the cost of replacing the allegedly defective

roofs which plaintiffs seek to recover constitutes the direct damage, not incidental

damage or consequential damages, caused by the wrongs alleged."  Id.  at 152 n.4 (citing

Correlli Roofing Co. v. Nat'l Instrument Co., 214 A.2d 919, 921 (Md. 1965)).

Direct damages may be measured by the cost necessary to repair or replace the

defective product.  In Mead Corp. v. NcNally-Pittsburg Mfg. Corp., 654 F.2d 1197, 1198

(6th Cir. 1981), the plaintiff sought damages resulting from the defendant's failure to

deliver a fully operational coal washing plant, which included a weigh station.  The

13

damages included losses due to closing of mines, premium lost, freight, loading and weighing charges, excess magnetite usage, repair costs, engineering charges, cost of replacement scales, cost of capital projects, excess field labor charges, and estimated future weighing charges until replacement scale was installed.  Id.  The defendant argued that most of the damages were consequential and, therefore, barred by the contract's exculpatory clause.  Id. at 1199.  The court held that some of the damages "[fell] within the concept of damages 'resulting in the ordinary course of events from the seller's breach' . . ., rather than consequential damages defined 'as any loss resulting from general or particular requirements and need of which the seller . . . had reason to know.'"[5]  Id. at 1209 n.17.  The court reasoned that "consequential damages usually encompass lost profits expected under contracts between the aggrieved party and third parties, and other expenses not incurred in order to cure the immediate defect in performance."  Id.

Indirect damages ordinarily require knowledge on the part of the defendant of the plaintiff's special circumstances.  In Applied Data Processing, the defendant contracted to provide the plaintiff with a sophisticated computer system.  394 F. Supp. at 508.  Because there was a clause limiting liability to direct damages, the parties disputed whether the

------

[5]Although the court was defining consequential damages in the context of the Uniform Commercial Code ("UCC"), its language is instructive because the definitions it provided use the same language as non-UCC decisions.  Notably, the parties cited propositions regarding the definitions of direct and indirect or consequential damages that arose out of UCC cases.  See, e.g., (Def's Motion to Mold Verdict, p. 22 (citing McNally Wellman Co. v. N.Y. State Elec. & Gas Corp., 63 F.3d 1188 (2d Cir. 1995))).

damages were direct or indirect.  The plaintiff sought damages for: (1) the cost of translating data in reliance on defendant's representations; (2) the cost of transporting the defective system back to the seller; (3) the labor costs of rerunning faulty reports; (4) the labor costs resulting from the malfunctioning of the computer system; (5) the cost of purchasing outside computer time; and (6) the labor costs of dealing with customers because of the computer system's failure to perform.  Id.

The court applied a two-part test to determine whether each was direct or indirect. First, the court considered whether the damages claimed were foreseeable.  Id. at 509-10. Second, the court determined whether the damages that were foreseeable were "in that category because such damages ordinarily follow the breach of a contract such as the lease agreement entered into by [the parties], or only because [the defendant] had knowledge of special circumstances."  Id. at 510.  The court held that no knowledge of special circumstances was required to know that: (1) the plaintiff would remove the equipment if it proved defective; (2) the plaintiff would have to pay its employees to rerun improperly processed reports; (3) the plaintiff would have to pay its employees idled by the equipment's unscheduled downtime; and (4) the plaintiff would have to purchase outside computer time if the defendant's equipment was unable to handle the plaintiff's obligations.  Id.  The court reasoned that "[a] reasonable man acquainted with the circumstances ordinarily attending transactions such as this one would know that these injuries would ordinarily follow a breach of warranty such as that alleged here."  Id.

15

Like the plaintiffs in 21st Century Props., who sought replacement of the defective roofs, Wärtsilä is seeking damages to, in essence, replace the defective consultant provided by Hill.  The damages sought include amounts expended to bring in new witnesses to testify as to matters that the consultant was otherwise capable prior to impeachment.  Contrary to Hill's assertion and as noted above, direct damages are not limited to the value of the service it provided.

In addition, like the damages sought by the plaintiff in Ryan Inc. E., the damages sought by Wärtsilä do not arise from special circumstances not ordinarily predicable.  The damages here are predictable because as Hill recognized at trial, when it is brought into the middle of a project, the project is troubled.  (Def's Motion to Mold Verdict, p. 10; Exh. G–Trail Tr. of David Richter, pp. 78:16-79:6.)  It does not test reason that a sophisticated business, one of whose purposes is to aid in the management of construction claims, should be aware that the manager it supplied to oversee a troubled project would be required to testify on behalf of the client.  Therefore, these damages are the natural and ordinary result of the breach of contract.

Similarly, like the plaintiff in Mead Corp., who sought damages for money it spent covering for the defendant's failure to provide the product that was the subject of the contract, Wärtsilä seeks damages from Hill for expenses directly related to covering for Hill's breach.  As a result of Hill's breach of contract and negligence, Wärtsilä was left in the middle of an arbitration proceeding with a key witness whose credibility had been

completely undermined.  Therefore, the expenses that Wärtsilä sought to recover were incurred in order to cure the immediate defect in Hill's performance.

Moreover, like the defendant in Applied Data Processing, Hill should know that these types of injuries would ordinarily follow a breach such as the one proved here because it is acquainted with the circumstances ordinarily attending transactions such as this one.  It is Hill's business to provide project and construction claims management.  In addition, the resumes provided by Hill included a representation of claims experience.  The claims process necessarily entails arbitration, or some other judicial-type proceeding.  It is reasonable to assume that a project manager it provided would be required to testify at or participate in the proceeding given his specialized knowledge of the industry and, more specifically, the project he managed.  Therefore, Hill did not need knowledge of any special circumstances to foresee these damages because they ordinarily follow such a breach.

Hill's reliance on Reynolds Metals Co. v. Westinghouse Elec. Corp., 758 F.2d 1073 (1985), is misplaced.  In Reynolds, the defendant contracted with the plaintiff to supply certain electrical equipment, namely, a transformer, and to provide a "competent Westinghouse service engineer" to oversee its installation.  Id. at 1074.  The defendant provided that "fulfillment of its liabilities under [the] warranty . . . [would be] by repair or replacement."  Id. at 1074 n.1.  The defendant further disclaimed any liability for "special, indirect, incidental or consequential damages."  Id. at 1074.  At the time of installation,

17

the defendant sent an employee, who, while he did have a degree in engineering, lacked extensive experience with transformer units and misunderstood his role to be one of technical assistant rather than supervisor.  Id. at 1075.  Less than a year after installation, the transformer unit failed.  Id.  The plaintiff sent the unit back to the defendant for repair under the terms of the warranty, but that claim was denied.  Id.  After a trial by jury, the plaintiff was awarded the cost to repair the transformer.  Id. at 1077.  The Fifth Circuit affirmed the jury's finding on liability but reversed and remanded for a new trial on damages.  Id. at 1080.  The court held that "the losses compensable under the agreement did not include costs of repair.  Id.  The court reasoned that "foreseeable damages are ordinarily recoverable under an expectancy theory, but they are nevertheless consequential losses and do not reflect the difference-in-value damages attributable to the original breach of contract."  Id.

Reynolds is inapposite for at least three reasons.  First, the court, in discussing whether there was a total failure of performance or just a breach of warranty, stated that:

> if [the individual supplied by the defendant] did not even qualify as a "competent" engineer and did not believe that it was his duty "to supervise" [the plaintiff] in the installation, then by supplying him [defendant] failed to perform at all as promised under the contract.  Such a failure would constitute a total failure of performance, a breach of contract for which the warranty disclaimer would not protect [the defendant], or at least the jury was entitled to so conclude on this record.

Id. at 1078.  This factual scenario, rather than the one presented to the court in Reynolds, is more akin to the facts of this case.  The result suggested by the Reynolds Court is

18

precisely the result that this Court reaches in Part A, supra–that a total failure of the contractual obligation renders the exculpatory clause ineffective.

Second, the Reynolds Court's reasoning–"that consequential losses . . . do not reflect the difference-in-value damages attributable to the original breach"–was based on section 2.714 of the UCC, which states, in pertinent part:

> Where the buyer has accepted goods . . . the measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

Id. at 1080 n.8 (quoting U.C.C. § 2.714(a)-(b) (ed. unknown)).  This Court finds the alternative measure of damages to be more appropriate in this case, as explained above, and does not find persuasive a definition of direct damages that is limited to difference-in-value in the face of statutory language that suggests an alternative measure.

Third, the incompetency of the engineer was not the only defect in performance. "The failure itself was the result of the assertedly improper design of a compression ring in the transformer," rather than the engineer that the defendant supplied, because he only prevented detection of the manufacturing/design defect.  Id. at 1075.

Finally, Hill argues that the damages are consequential because:

> Wärtsilä's arbitration expenses were not "an invariable result" of this breach. Rather, the expenses happened three years after the breach–after Wärtsilä hired LeFebvre away from Hill, after the Nejapa plant was finished and brought on-line, after Wärtsilä and BVI could not amicably resolve their differences and after Wärtsilä and Jack Clegg formulated and prepared Wärtsilä's arbitration case with LeFebvre and numerous other experts as its centerpiece.  All of those

19

<u>events, even if arguably foreseeable, were certainly not unavoidable in 1995.</u>

(Def's Motion to Mold Verdict, p. 20) (emphasis added).  Hill's focus on "those events"

is erroneous.  It is not each of the listed events that is required to be foreseen; rather, what

must be foreseen is that the consultant it provided, on the type of project that Hill itself

classified as "troubled," will be required, at some point, to represent the client in a

situation where credibility is key.  Moreover, the result of the breach–that the consultant

Hill provided to Wärtsilä was incredible–<u>was</u> unavoidable in 1995.  Had Hill not been

negligent, and had Hill not breached the contract, as both were found by the jury, the

consultant would not have been impeached and exposed as incredible at the arbitration

regarding the very troubled project to which he was assigned by Hill.

Based on the analysis above, the Court finds that the damages recovered by

Wärtsilä–including: (1) the costs associated with having the Hill consultant as an integral

part of the original arbitration; and (2) the costs associated with re-arbitrating in an

attempt to repair the damage caused by losing all testimony associated with the Hill

consultant–are direct damages.  That is, they are the natural and ordinary result of Hill's

breach of the contract.  Therefore, the motion to mold the verdict will be denied.

**<u>CONCLUSION</u>**

Having considered the remainder of both parties' arguments and based on the

foregoing, Hill's Motion to Mold the Verdict [Docket No. 258] will be denied.

An appropriate Order will issue this date.




/s/ Joseph H. Rodriguez
Joseph H. Rodriguez, U.S.D.J.


Dated: June 28th, 2006